UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT C. OLSON,                                    No. C-06-07487 JCS

           Plaintiff(s),

                                                   **ORDER GRANTING IN PART AND**
     v.                                            **DENYING IN PART PLAINTIFFS'**
                                                   **MOTION FOR SUMMARY JUDGMENT**
DALE BECK, ET AL.,                                 **AND AWARDING SANCTIONS**
                                                   **AGAINST DEFENDANTS FOR FAILURE**
           Defendant(s).                           **TO COMPLY WITH LOCAL RULES**
_____/                  **[Docket Nos. 107, 144]**

## I.       INTRODUCTION

          Plaintiffs Robert C. Olson and Daphne L. Olson, as Trustees of the Olson Family Trust and

as individuals, initiated this action in 2006, seeking damages and injunctive relief in connection with

the alleged contamination of their property resulting from the operation of a service station on an

adjacent property, owned by Defendants.  This is not the first action brought by the Olsons in

connection with the contamination; in 1992 they sued Dale Beck in the Superior Court of Contra

Costa County and in 1997 that court entered judgment in favor of the Olsons, finding that the

contamination of the Olson's property was caused by releases of chemicals on the Becks' property,

which were continuing to migrate to the Olson's property.  The Superior Court ordered Dale Beck to

remediate the contamination so that a clearance certificate might be issued by the Regional Water

Quality Control Board indicating that the contamination had been cleared in accordance with state

standards.  The remediation was to be completed by May 2, 1997.  Almost ten years later, in

December 2006, no certificate had issued and the Olsons initiated the instant action.  Plaintiffs

entered into a settlement agreement with some of the Beck Defendants. *See* Docket No. 75.  Thus,

the only remaining defendants in the case are the estates of Franz A. Beck, Sandra Beck and Roberta

Beck ("the Becks").

Currently before the Court are two related matters.  First, Plaintiffs have filed a motion seeking summary judgment on Claims Three through Six of their First Amended Complaint against the Becks ("the Motion").  This Motion was filed in 2010 but the Court deferred ruling on it based on representations that the parties were close to reaching a settlement.  No further delay in deciding the summary judgment motion can be justified.  Second, the Court considers whether an award of sanctions is warranted based on the filing by the Becks of a supplemental opposition brief on the summary judgment motion on the day of the Motion hearing.  Prior to filing the supplemental opposition brief, the Becks had filed only a four-page brief which, while styled as an "opposition" to the summary judgment motion, failed to address in a meaningful way any of the legal questions raised in the summary judgment motion and was supported by no evidence.  *See* Docket No. 129.

A hearing on the summary judgment motion was held on April 1, 2011.  On April 5, 2011, the Court issued an order to show cause why Defendants should not be subject to sanctions as a result of their last-minute filing of the supplemental opposition, and a show cause hearing was held on April 29, 2011.   The Court's rulings on these matters are set forth below.[1]

## II.    ORDER TO SHOW

In its Order to Show cause, the Court ordered Defendants to show cause why they should not be sanctioned for their failure to comply with the local rules and the Court's orders in filing a supplemental opposition brief on the day of the Motion hearing and a supporting declaration by Barbara Fye – Sandra Beck's daughter – at the close of business the day before the hearing, at 4:57 p.m. on March 31, 2011.[2]  The only justification offered by Defendants for waiting until the day of

---

[1]The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2]Defendants also cited to exhibits in the supplemental opposition; those exhibits were not actually filed until almost three weeks after the motion hearing, on April 20, 2011.  In addition, Plaintiffs' counsel, who was attempting to frame a response for the Court addressing the issues raised in Defendants' supplemental opposition, was required to make repeated requests for copies of the exhibits filed by Mr. Woods and only received them on April 18 and 19, 2011. *See* Declaration of John R. Till in Support of Plaintiffs' Reply to Counsel for the Beck Defendants' Response to the Court's Order to Show Cause, ¶¶ 13-17.

**United States District Court**
For the Northern District of California

1   the hearing to file their supplemental opposition brief was that defense counsel Robert Wood

2   "genuinely believed" that the case would settle.  *See* Docket No. 145.  Having considered the

3   parties' submissions in connection with the Order to Show Cause, the Court concludes that the

4   burden imposed on Plaintiffs and the Court as a result of Defendants' conduct justifies an award of

5   sanctions reflecting the additional fees Plaintiffs incurred in responding to Defendants' supplemental

6   brief.

7        The Court may impose attorneys' fees as a sanction on at least three legal grounds.  First,

8   under 28 U.S.C. § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case

9   unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

10  expenses, and attorneys' fees reasonably incurred because of such conduct."  Sanctions under §

11  1927 may be imposed sua sponte. *Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc*., 210 F.3d

12  1112, 1118 (9th Cir.2000). Second, under Civil Local Rule 11-6, the court may impose "appropriate

13  sanctions" if the court "has cause to believe an attorney has engaged in unprofessional conduct."

14  Civ. L.R. 11-6(a)(2)-(3). Third, courts have inherent power to issue sanctions as necessary to

15  "manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

16  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1992) (citation and quotation marks omitted).

17       Defendants' last-minute filing is inexcusable.  Plaintiffs' summary judgment motion was

18  filed almost a year before the April 1, 2011 motion hearing.  On August 20, 2010, Defendants filed a

19  brief that was styled as an opposition but did not address the legal issues raised in the summary

20  judgment motion, as the Court pointed out in its August 30, 2010 Order requesting a status report

21  regarding the ongoing mediation efforts in the case.  Rather than requesting leave to file a

22  supplemental brief addressing the Court's concern at that time, Defendants waited seven months *and*

23  *then* filed a brief and declaration that raised  new issues, including whether the 1990 Beck Family

24  Trust is even a valid trust – a defense that could and should have been raised years ago.  Nothing in

25  the supplemental brief or supporting materials suggests that any new facts had come to light that

26  explained the last-minute filing.  Rather, Defendants' arguments were based on the contention that

27

28                                               3

United States District Court

For the Northern District of California

1   Sandra Beck had already been diagnosed with Alzheimer's disease at the time she signed the 1990

2   Beck Family Trust Agreement.   As a result of Defendants' supplemental opposition, Plaintiffs were

3   required to incur attorneys' fees in connection with their response, which amounted to a *second*

4   reply brief on their summary judgment motion.   These additional fees shall be paid by Defendants as

5   a sanction for Defendants' improper conduct.

6         In order to calculate the amount of the sanction, the Court uses the lodestar approach, which

7   multiplies the number of hours reasonably expend by a reasonable hourly rate.   *See Fischer v.*

8   *SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433

9   (1983)).   Plaintiffs have provided a declaration by attorney John Till documenting the fees incurred

10   in connection with Plaintiffs' response to Defendants' supplemental opposition.   *See* Declaration of

11   John R. Till in Support of Plaintiffs' Fees and Costs Stemming from Sanctions Issued Based on

12   Court's Order to Show Cause ("Till Fee Decl.").   In the declaration, which is supported by detailed

13   time sheets, Plaintiffs request $12,624.94 in fees based on 46.9 hours of work by attorneys John Till

14   (at a rate of $285.00 per hour) and Bret A. Stone (at a rate of $250.00 per hour).   Till Fee Decl., Exs.

15   1 & 2.   Till states that these fees represent only the fees that were incurred as a result of Defendants'

16   supplemental opposition brief and do not include fees for time spent in connection with drafting the

17   summary judgment proposed order requested by the Court, settlement discussions, or "other related

18   work."   Till Fee Decl., ¶¶ 3-4.   Having reviewed the time sheets submitted by Plaintiffs, the Court

19   finds that both the rates requested and time billed are reasonable and therefore awards attorneys'

20   fees in the full amount requested, that is $12,624.94, as a sanction.

21   **III.     MOTION FOR SUMMARY JUDGMENT**

22         **A.     Background**

23               **1.     First Amended Complaint**

24         In the First Amended Complaint, Plaintiffs offer the following allegations with respect to

25   Defendants:

26         4. Defendants Dale Beck and Franz A. Beck owned and operated a business known as Geary
             Road Service, an unincorporated California business, which conducted repair services and

27

28                                              4

sold petroleum products, including leaded and unleaded gasoline at and from 1986 Geary Road, at the Beck Property in Contra Costa County, which is or was owned by, operated by, or in privity with Defendants Dale Beck (aka D. A. Beck), the 1992 Beck Family Trust (aka Beck 1992 Family Trust), the 1990 Beck Family Trust (aka Beck 1990 Family Trust), the Beck Family Trust, Estate of Franz A. Beck (aka F.A. Beck and F. Alvin Beck), Deceased and his estate, William Beck (aka Bill Beck), Sandra I. Beck, Paul R. Beck, Estate of Roberta C. Beck, Deceased and her estate.

5. Defendants Dale Beck (aka D. A. Beck), the 1992 Beck Family Trust (aka Beck 1992 Family Trust), the 1990 Beck Family Trust (aka Beck 1990 Family Trust), the Beck Family Trust, Estate of Franz A. Beck (aka F.A. Beck and F. Alvin Beck) (hereafter, "Franz A. Beck"), Deceased and his estate, William Beck (aka Bill Beck), Sandra I. Beck, Paul R. Beck, Estate of Roberta C. Beck, Deceased and her estate owned, operated or are in privity with the owners of the Beck Property from which chemicals were released.

Plaintiffs offer the following "General Allegations"in their First Amended Complaint:

### Property Ownership and Description of the Olson Property

12. Plaintiffs are the owners of the residentially zoned property located at 1964 Geary Road, Pleasant Hill, Contra Costa County, California (assessor parcel number: 170-242-051-2) ("Olson Property"). Plaintiffs purchased the Olson Property in approximately 1974.

13. The Olson Property is approximately .78 acres, which is adjacent to and downgradient of the Beck Property.

### Property Ownership and Description of the Beck Property

14. The Beck Property is located at 1986 Geary Road, Pleasant Hill, California (assessor parcel number: 170-242-017-3) (the "Beck Property"). Plaintiffs are informed and believe that Franz a. Beck, father of Dale Beck, purchased the property in approximately 1955 and thereafter each of the following Defendants have or had an ownership interest in the Beck Property: Dale A. Beck, Roberta C. Beck, Deceased, Bill Beck (aka William Beck), Franz A. Beck (aka F. Alvin Beck and Franz Beck) and Bill Beck as tenancy in common, 1990 Beck Family Trust (aka Beck 1990 Family Trust), and the 1992 Beck Family Trust (aka Beck 1992 Family Trust).

15. The Beck Property is approximately .76 acres, which is adjacent to and upgradient of the Olson Property.

16. Dale Beck was aware of the contamination at and emanating from the Beck Property prior to establishing the 1992 Beck Family Trust. Dale Beck was aware of the contamination at and emanating from the Beck Property prior to transferring the Beck Property to the 1992 Beck Family Trust and then he returned the Beck Property to the 1990 Beck Family Trust.

17. Both the 1990 Beck Family Trust and the 1992 Beck Family Trust have been or are owners of the Beck Property and responsible for any and all nuisance conditions at or emanating from the Beck Property to the Olson Property or any other property in the vicinity of the Beck Property.

### Geary Road Service Operations at the Beck Property

5

18. Franz A. Beck owned and operated Geary Road Service at the Beck Property starting in approximately 1955 until Dale Beck took over the ownership and operation the Geary Road Service business from his father. The Beck Property also operated as a service station from at least the mid-1950s to approximately 1985.

19. The Plaintiffs are informed and believe that over the years several leaking underground storage tanks ("UST") were removed, replaced and ultimately removed again from the Beck Property. At the time Franz A. Beck purchased the Beck Property, one 550 gallon UST was already located at the Beck Property. In the early to mid-1960s a second large UST was installed on the Beck Property. This UST was removed and replaced approximately 5-6 years after it was installed because the tank was having water intrusion and leaking problems. The replacement tank also started leaking and having water intrusion problems and it was also replaced. In approximately 1985, two leaking USTs, with 1,000 and 550-gallon capacities and were finally removed without replacement from the Beck Property.

20. The leaking USTs and potentially other releases of various chemicals at and from the Beck Property have contaminated both the Beck Property and the Olson Property.

**Contamination at and Emanating from the Site**

21. Previous investigation and remedial activities have documented that soil and groundwater on both the Beck and Olson properties have been impacted by a release of petroleum products from the USTs formerly located on the Beck Property. In an incomplete attempt to address these adverse impacts, approximately 3,300 cubic yards (CY) of impacted soil were removed from the Beck and Olson properties during two excavation at the Site. The first excavation in April 1996 of approximately 1,500 CY of soil was removed from the vicinity of the former tank pit on the Beck Property and the southwestern corner of the Olson Property. Another 1,800 CY of impacted soil was then excavated from the two properties between December 2003 and February 2004. According to the information provided in the Corrective Action Report by Mr. Beck's environmental consultants dated April 15, 2004, free product was observed floating on the groundwater surface within the limits of the excavation completed on both properties. In addition, the August 5, 2004 Response to Request for RAP for the Beck Trust states that during corrective action activities conducted between November 2, 2003 and February 9, 2004, the hydrocarbon plume extended continuously from the perimeter of the old excavation to the final extent of the excavation. This document also concluded that the source of petroleum hydrocarbons in the soil excavated from the Olson Property was associated with the migration of contaminants from a source on the Beck property.

22. Total Petroleum hydrocarbons gasoline ("TPHg") is a term used to describe a large family of chemical compounds that come from gasoline. Gasoline released into the environment can cause contamination of the environment. TPHg has been detected at the Olson Property as recently as June 2006 at concentrations in excess of 3,500 mg/kg in soil and 83,000 (ug/L) in groundwater both of which are several orders of magnitude higher than the maximum contaminant levels ("MCLs") established by law.23. The analytical results from the soil samples collected from borings at the Site exceed the Environmental Screening Levels (ESLs) established by the California Regional Water Quality Control Board – San Francisco Bay Region (RWQCB) for the following chemicals: benzene, toluene, ethylbenzene, total xylenes, TPHg and TPHd.

United States District Court
For the Northern District of California

24. Defendants' own environmental consultant determined that the levels of contamination at the Olson Property from the Beck Property exceeded ESLs for both residential and commercial properties uses.

25. On information and belief, Plaintiff asserts that Defendants used and released at least the following hazardous waste, solid wastes, and hazardous substances, including but not limited to: benzene, toluene, ethylbenzene, total xylenes, TPHg and TPHd, various cleaning solvents and heavy metals (collectively, "Chemicals of Concern"). The Chemicals of Concern released into the environment in, at, around, and in the vicinity of the Site are "hazardous wastes" and "solid wastes" within the meaning of RCRA §§ 1004(5) and (27), and 7002(a)(1)(B), 42 U.S.C. §§ 6903(5), (27), 6972(a)(1)(B), because they are discarded materials resulting from industrial, commercial, or community activities that, because of their concentration or chemical characteristics, may pose a substantial present or potential hazard to human health or the environment when improperly disposed of or otherwise managed. Chemicals of Concern in the soil, saturated subsurface zone, and in the groundwater in, at, around, and in the vicinity of the Site are "wastes" within the meaning of California Water Code §§ 13050(d) and 13304 because they are liquids, solids, or gaseous substances associated with human habitation, or of human origin, or from a producing or processing operation that is being or has been discarded or intended to be discarded from a manufacturing or processing operation. The Chemicals of Concern are "hazardous substances" within the meanings of Health & Safety Code § 25316 as they are hazardous wastes having the characteristics identified under or listed pursuant to 42 U.S.C. § 6921.

26. "Solid wastes," "hazardous wastes," "wastes," and "hazardous substances," including but not limited to Chemicals of Concern, are present in the environment in, at, around, and in the vicinity of the Site in concentrations that exceed applicable and relevant federal and state standards. These "solid wastes," "hazardous wastes," "wastes," and "hazardous substances" have migrated and continue to migrate, polluting and threatening to pollute soil and groundwater beneath and adjacent to Plaintiffs' property.

27. The "solid wastes," "hazardous wastes," "wastes," and "hazardous substances" present in the environment in, at, around, and in the vicinity of the Site have commingled in the environment, including without limitation the surface and subsurface soil at, and groundwater beneath, and adjacent to, the Site to create a single indivisible harm and potential imminent and substantial endangerment to the public health, welfare, and the environment.

28. The release of "solid wastes," "hazardous wastes," "wastes," and "hazardous substances" has resulted in a condition that may present an imminent and substantial endangerment to health or the environment, is a condition of public nuisance, and has resulted in actual and threatened injury to property of the State, specifically including its waters, and to Plaintiffs' Property.

29. California has a public policy which requires no degradation of groundwater.

30. Franz A. Beck was aware of the contamination at and emanating from the Beck Property prior to establishing the 1990 Beck Family Trust. Dale Beck was aware of the contamination at and emanating from the Beck Property prior to his father, Franz A. Beck, establishing the 1990 Beck Family Trust. Franz A. Beck did not sufficiently fund the 1990 Beck Family Trust to investigate and remediate the contamination at and emanating from the Beck Property.

7

**United States District Court**
For the Northern District of California

31. The underground storage tanks at the Beck Property released petroleum products into the soil and groundwater at the Beck Property, the Olson Property and into the environment. The petroleum products released from underground storage tanks at the Beck Property may pose a threat to the environment and/or a threat to human health.

32. The petroleum products released from the underground storage tanks at the Beck Property have been and continue to migrate in the environment. The migration of petroleum products released from underground storage tanks at the Beck Property into the environment adversely impacts the environment.

33. The existence of petroleum products released from USTS at the Beck Property onto the Olson Property have and are adversely affecting the value of the Olson Property.

34. Petroleum products released from the underground storage tanks at the Beck Property into the environment are wastes and hazardous wastes and have no current use.

35. Chemicals of Concern (including but not limited petroleum and nonpetroleum products) released at or from the operations at the Beck Property are hazardous substances. The petroleum products and other Chemicals of Concern released from the underground storage tanks and/or during operations at the BeckProperty are hazardous wastes.

36. Hazardous substances and/or hazardous wastes in the environment are injurious to health and are offensive to the senses, obstruct the free use of the Olson Property, so as to interfere with the comfortable enjoyment of the property impacted by the contamination.

37. Hazardous substances and/or hazardous wastes released at or from the Beck Property continue to remain at the Olson Property.

38. Hazardous substances and/or hazardous wastes, including but not limited to petroleum and non-petroleum products, released into the environment at or from the operations at the Beck Property are or maybe injurious to health, offensive to the senses, obstruct the free use of the Olson Property so as to interfere with the comfortable enjoyment of the Olson Property.

39. Each Defendant is at least one of the following: a) the current or former owners, operators, successors in interest or in privity with the current and former owners of the Beck Property; and/or b) the current or former owners, operators, successors in interest or in privity with the current or former owners or operators of business at the Beck Property.

40. Plaintiffs are informed and believe and thereupon alleged that each of the fictitiously named Defendants is responsible in some manner for the occurrences or the failure to abate the occurrences herein alleged and that Plaintiffs' damages as herein alleged were proximately caused by their conduct or omissions.

41. Plaintiffs are informed and believe and thereupon allege that each of the Defendants were the agent and servant of all of the other Defendants and were acting within the course and scope of such agency, capacity, and employment.

42. Plaintiffs' Property is topographically downhill and lower than Defendants' Property and, as a result, liquids released onto the surface and into the sub-surface have flowed and will continue to flow from Defendants' property or the operations of the business that operated at the Beck Property to Plaintiffs property.

8

United States District Court
For the Northern District of California

43. For many years Defendants and their predecessors in interest, agents or tenants owned, operated, or maintained an internal combustion engine repairing service business on the Beck Property. In addition, in connection with the business operations at the Beck Property and for sale to the public the Defendants and their predecessors in interest, agents, representatives, or tenants installed, owned, operated, or maintained underground storage tanks together with the dispensing pumps and nozzles. Plaintiffs are informed and believe that said underground storage tanks contained various petroleum products.

44. Plaintiffs are informed and believe that Defendants predecessor in interest in the real property and former operator of Geary Road Service was Defendant Dale A. Beck's father, Franz A. Beck, Deceased.

45. Plaintiffs are informed and believe and thereupon allege that during the time that each of the Defendants and their respective predecessors in interest were in possession of the premises, Defendants knowingly permitted leaded gasoline, unleaded gasoline, diesel fuel products, other petroleum products, and other chemicals to be released into the soil and groundwater underlying Plaintiffs' and Defendants' property which releases Defendants knowingly concealed or negligently concealed in violation of law. Such releases by Defendants were and continue to be unabated.

46. Plaintiffs are informed and believe and thereupon allege that such releases may be continuing to this day or that the past releases are continuing to move in the environment.

47. Plaintiffs premises cannot be developed for any retail, commercial, residential, or other use until the contamination on the premises and contaminated areas are remedied and environmental studies are completed to assess the potential risk to the public from any particular future development.

48. This public nuisance condition, which is the result of historic discharges of toxic substances discarded from the Defendants' activities at the Beck Property over the course of several decades, may be jeopardizing the public health, safety, and/or the environment.

49. Plaintiffs have been specially injured by this public nuisance by the fact that Plaintiffs' property is adjacent to and down-gradient from the Beck Property, and therefore is specifically impacted by this continuing nuisance.

50. The Defendants are persons whose commercial activities have involved ownership of "disposal facilities" or the generation, handling and disposal of "solid wastes," "hazardous wastes," "wastes," and "hazardous substances" in, at, around and in the vicinity of the Site. Under both federal and state law, the Defendants are strictly, jointly and severally liable for investigation and abatement of the risks and damage associated with their activities at the Beck Property which caused or contributed to the contamination.

51. Each of the Defendants caused or contributed to the presence of Chemicals of Concern in the environment in, at, and around the Site, including the waters of the State of California, because each Defendant released or otherwise discarded Chemicals of Concern during business operations, grading and excavation activities, or construction activities, or controlled the property from which Chemicals of Concern were released or otherwise discarded, but failed to prevent or abate this "solid waste," "hazardous waste," "waste," and "hazardous substance" contamination.

52. Chemicals of Concern disposed of or released into the environment by each of the Defendants constituted material which was used in the Defendants' commercial and industrial operations and, as a result of contamination, could no longer serve the purpose for which that material was produced without processing.

53. The Defendants have failed to prevent or abate the imminent and substantial endangerment, public nuisance, private nuisance, and actual and threatened injury to property of the State and to Plaintiffs' property at issue in this Complaint. The resulting environmental contamination may present an imminent and substantial endangerment to health or the environment, and has created a public nuisance, private nuisance, and actual and threatened injury to property of the State and Plaintiff's property as well as surrounding properties, all of which are continuing and progressive and, upon information and belief, will persist until abated.

54. As a result of each of the Defendants' releases of "solid wastes," "hazardous wastes," "wastes," and "hazardous substances," Plaintiffs have incurred and will continue to incur response costs in order to investigate and remediate the condition of "solid waste," "hazardous waste," "waste," and "hazardous substance" contamination.

55. All groundwater within the State of California, including the groundwater in, at, around, and in the vicinity of the Site and all groundwater that has been, and that may be, adversely impacted by nuisance conditions at and emanating therefrom is a "water of the state" pursuant to California Water Code § 13050(e).

### The 1997 Judgment

56. Robert Olson has attempted to resolve this ongoing and continuing contamination issue since he first discovered the problem more then 20 years ago. At the time that Mr. Olson discovered the contamination at and emanating from the Beck Property, Mr. Olson informed both Dale Beck and Franz A. Beck of the contamination problem and requested that they address the problem promptly. Mr. Olson was assured by both Dale Beck and Franz A. Beck that they would "handle" and "take care" of the problem – that they would determine the extent of the contamination and cleanup the contamination.

57. After years of attempting to resolve the issues relating to the contamination without costly litigation, Mr. Olson finally brought suit against Dale Beck in 1992. Mr. Olson filed an action entitled Robert Olson, et al v Dale Beck, et al in the Superior Court of California, Contra Costa County, Case No. C92-04832 (hereafter referenced as the "1992 Lawsuit"). The state court found in favor of Mr. Olson and issued a judgment against Dale Beck to enjoining him to investigate and remediate the contamination at and emanating from the Beck Property onto the Olson Property. Attached hereto as Exhibit 1 is a certified copy of the July 25, 1997 judgment issued against Dale Beck in favor of Robert Olson, as trustee of the Olson Family Trust, which was filed and served on or about July 25, 1997 on Defendant Dale Beck (hereafter referenced as the "1997 Judgment").

58. The 1997 Judgment held the following:

    a. All of the contamination at the Olson Property was caused by releases of chemicals at and emanating from the Beck Property and/or operations at the Beck Property.

    b. The contamination at the Olson Property from the Beck Property is continuing to migrate in the environment.

c. The contamination at the Olson Property came from the Beck Property.

d. The contamination from the Beck Property has degraded the groundwater at the Site.

e. Dale Beck and his officers, agents, employees, representatives and all persons acting in concert or participating with Dale Beck have failed to determined the nature and extent of the contamination at the Site, the Site includes the Beck Property, the Olson Property, as well as any additional property which may have been, may be or is threatened to become contaminated by the contamination at, emanating, or originating from the Beck Property.

f. Enjoined and restrained Defendant Dale Beck officers, agents, employees, representatives and all persons acting in concert or participating with him from maintaining, permitting and/or continuing to maintain and/or permit the contamination of Plaintiffs' real property by contaminants which originate from Beck Property.

g. Affirmatively ordered Dale Beck, his officers, agents, employees, representatives and all persons acting in concert or participating with Dale Beck to undertake at their sole cost and expense, evaluation of the extent of the contamination of the Olson Property as well as the source of the contamination upon the Beck Property and shall thereafter cause said contamination to be remediated so that a clearance certificate might be issued by the RWQCB on or before May 5, 1997.

h. None of the contamination at the Beck Property or at the Olson Property was from the Olson Property and that the contamination is ongoing and presents a continuing nuisance and trespass on the Olson Property.

i. No cleanup on the Olson Property was feasible or reasonable without the cleanup of the Beck Property.

j. Robert and Daphne Olson have been hindered in the quiet enjoyment and use of the Olson Property due to the contamination condition at and emanating from the Beck Property.

k. The contamination on the Olson Property has prevented the Olsons from obtaining loans on the Olson Property. This inability to obtain a loan on the property has caused continuing damages in missed investment opportunities.

l. The contamination on the Olson Property was of a continuing nature as that term is used in California trespass and nuisance cases.

m. The contamination on the Olson Property is ongoing and is due to gasoline released at, on or from the Beck Property.

n. The benefit to Robert Olson in being able to develop, encumber and alienate his property outweighs the burden to Dale Beck to correct the condition.

o. Dale Beck did not claim any current overriding usefulness for thegasoline on his land.

11

United States District Court

For the Northern District of California

1    p. There is no current usefulness of the gasoline located in the soil and groundwater at
2    or emanating from the Site.

3    q. Dale Beck and his officers, agents, employees, representatives and all persons
     acting in concert or participating with Dale Beck have failed to investigate and
     remediate the Site.

4

5    r. Dale Beck and his officers, agents, employees, representatives and all persons
     acting in concert or participating with Dale Beck have failed to pay the necessary
6    funds to reimburse Robert Olson for costs of remediation or evaluation of
     contamination incurred on after May 2, 1991.

7    s. Dale Beck and his officers, agents, employees, representatives and all persons
     acting in concert or participating with Dale Beck have failed to reduce levels of
8    contamination at the Site to levels below State standards regarding gasoline and
     petroleum products.

9

10   59. As of December 4, 2006, the nature and/or the extent of the contamination at and/or
     emanating from the Beck Property has not been determined. More than 20 years after
11   Plaintiffs notified Defendants of the contamination problem, the contamination still remains
     and continues to move in the environment.

12   60. As of December 4, 2006, the RWQCB has not issued a clearance certificate to any person
     demonstrating that Dale Beck has fulfilled his responsibilities required under the 1997
13   Judgment.

14   61. The contamination released at or from the Beck Property has reduce the value of the
     Olson Property and has adversely impacted the ability of Olson to market, develop, transfer
15   or otherwise encumber the Olson Property.

16   FAC, ¶¶ 12-61.

17        On the basis of these factual allegations, Plaintiffs asserted the following causes of action: 1)

18   violation of the  Comprehensive Environmental Responses, Compensation and Liability Act

19   ("CERCLA")§ 107(a), 42 U.S.C. § 9607(a); 2) violation of CERCLA § 113(f), 42 U.S.C. § 9613(f);

20   3) Abatement of an Imminent and Substantial Endangerment Pursuant to RCRA § 7002(a)(1)(B), 42

21   U.S.C. § 6972(a)(1)(B); 4) Abatement of a Public Nuisance Pursuant to California Law; 5)

22   Abatement of a Public Nuisance Per Se Pursuant to Municipal Code; 6) Abatement of a Private

23   Nuisance Pursuant to California Law; 7) Continuing Trespass; 8) Negligence; 9) Negligence Per Se;;

24   10)  Intentional Infliction of Emotional Distress; 11) Negligent Infliction of Emotional

25   Distress; 12) Ultrahazardous Activity; 13) Declaratory Relief; and 14) Enforcement of 1997

26   Injunction Order.

27

28                                              12

1   The First Amended Complaint names the following defendants: 1) Dale Beck, individually,

2   dba Geary Road Service; and as Trustee of the 1992 Beck Family Trust, Trustee of the 1990 Beck

3   Family Trust, and Trustee of the Beck Family Trust; 2) 1990 Beck Family Trust, as a Trust and dba

4   Geary Road Service; 3) 1992 Beck Family Trust, as a Trust and dba Geary Road Service; 4) the

5   Beck Family Trust, as a Trust and dba Geary Road Service; 5) Estate of Franz A. Beck, Deceased; 6)

6   William Beck, individually and dba Geary Road Service; 7) Sandra I. Beck, individually and dba

7   Geary Road Service; 8) Paul R. Beck, individually and dba Geary Road Service; 9) Estate of

8   Roberta C. Beck, deceased, individually and dba Geary Road Service.

9   On January 18, 2008, Plaintiffs stipulated to the dismissal of the Beck Family Trust based on

10  Defendants' representation that there is no such entity.

11  On November 21, 2008, the Court approved a settlement between Plaintiffs and Defendants

12  Dale Beck, individually and as Trustee of the 1990 Beck Family Trust and the 1992 Beck Family

13  Trust, William Beck, and Gerry Beck, individually and as Trustee of the 1990 Beck Family Trust.

14  **2.      Answer[3]**

15  In their Answer, Defendants admit many of the allegations in the First Amended Complaint,

16  including the following:

17  4. Defendants admit that for a period of time, Franz A. Beck owned and operated a business
    known as Geary Road Service, an unincorporated business, and further admit that the

18  business conducted repair services and sold gasoline, and may also have sold some
    lubricating oil for light machinery, at or from 1986 Geary Road, Pleasant Hill, CA, that Dale

19  Beck worked in the business with his father, Franz A. Beck, and assumed the operation and
    ownership of the business upon his father's death . . . .

20

21  5. Defendants admit that for a period of time, Franz A. Beck owned and operated a business
    known as Geary Road Service, an unincorporated business, and that Dale Beck assumed the

22  operation of the business upon his father's death . . . .

23  . . .

24  **Property Ownership and Description of the Beck Property**

25  _____

26  [3]On February 22, 2007, an Answer was filed by Defendants Dale Beck, the 1990 Beck Family
    Trust and the 1992 Beck Family Trust.  Docket No. 8.  Subsequently, the parties stipulated that this

27  Answer would constitute the Answer of the Estates of Franz A. Beck, Sandra I. Beck and Roberta C.
    Beck as well.  Docket No. 58.

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

14. Defendants admit that the Beck property is located at 1986 Geary Road, Pleasant Hill, CA (assessor parcel number: 170-242-017-3), and further admit that Franz A. Beck, father of Dale Beck, purchased the property in approximately 1955, and Defendants further admit that at some point the 1990 Beck Family Trust acquired the property . . .

15. Defendants admit that the Beck property is "upgradient" of the Olson property (that is, uphill from the Olson property) . . . .

16. Defendants admit that Dale Beck was aware, before establishing the 1992 Beck Family Trust, that gasoline had leaked onto or into the Beck Property from an underground storage tank or tanks . . . .

17. Defendants admit that the 1990 Beck Family Trust has been and continues to be the owner of the Beck Property . . . .

**Geary Road Service Operations at the Beck Property**

18. Defendants admit that Franz A. Beck owned and operated Geary Road Service at the Beck Property starting in approximately 1955 until Dale Beck took over the ownership and operation of Geary Road Service from his father. . . . .

19. Defendants are informed and believe that when the Beck property was purchased in approximately 1955, there was already an existing UST on the property, approximately 550 gallons; Defendants are further informed and believe that some time thereafter, a second UST was installed on the Beck property, but was subsequently removed because of leakage; Defendants are further informed and believe that in approximately 1985, two leaking UST's were removed from the Beck property, and were never replaced. . . . .

20. Defendants are informed and believe that some gasoline leaked from one or more UST's on the Beck property, some of which is believed to have spread to the Olson property . . . .

**Contamination at and Emanating from the Site**

21. Defendants are informed and believe that soil on both the Olson and Beck properties have been impacted by the release of gasoline from underground storage tanks; Defendants are further informed and believe that approximately 3300 cubic yards of soil were removed from the Beck and Olson properties, from two different excavations, one occurring in about April of 1996, and the other occurring during and after December, 2003; Defendants have insufficient information to admit or deny the remaining allegations of this paragraph, and on that basis deny them.

. . .

23. Defendants are informed and believe that on at least one occasion, soil samples taken from the Olson property showed levels of benzene, toluene, ethylbenzene, total xylenes, TPHg and TPHd, in excess of the Environmental Screening Levels (ESL's) established by the California Regional Water Quality Control Board—San Francisco Bay Region . . . .

. . .

14

25. Defendants are informed and believe that at least some gasoline was released from UST's on the Beck property; with that exception, Defendants deny that they used or released on their property any other substances which might qualify as "wastes," "hazardous waste," "solid waste," or "hazardous substances;" . . . .

26. Defendants are informed and believe that at least some gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, are or have been present on both the Beck and Olson properties, in quantities which exceed at least some state and/or local standards; Defendants are informed and believe that at least some gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, have migrated in the past from the Beck property to the Olson property; Defendants otherwise deny the allegations of this paragraph.

. . .

28. Defendants are informed and believe that at least some gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, have migrated in the past from the Beck property to the Olson property, resulting in some degree of damage thereto . . .

. . .

31. Defendants are informed and believe that at least some gasoline leaked from UST's on the Beck property, and that gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, migrated in the past from the Beck property to the Olson property . . . .

32. Defendants are informed and believe that at least some gasoline leaked from UST's on the Beck property, and that gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, migrated in the past from the Beck property to the Olson property; Defendants are informed and believe that the leakage of gasoline from UST's on the Beck property, and migration in the past to the Olson property, has to some degree adversely affected both properties . . . .

. . .

39. Defendants deny that Defendant Dale Beck and the 1992 Beck Family Trust were ever owners of the Beck property, though they admit that Defendant Dale Beck has been the owner and operator, since his father's death, of the Geary Road Service business; Defendants further admit that Defendant 1990 Beck Family Trust has been the owner of the Beck property since that Trust was established in about 1990, though they deny that that Trust (or the 1992 Beck Family Trust) was ever the owner or operator of the Geary Road Service business . . . .

42. Defendants admit that the Olson property is "topographically downhill" from the Beck property; Defendants further admit that some liquids released onto the surface and/or into the sub-surface may flow from the Beck property down into or onto the Olson property . . . .

43. Defendants admit that for many years and currently, Defendant Dale Beck owned and operated the Geary Road Business on the Beck property, and one aspect of this business was

15

the repair and servicing of small internal combustion engines, for example, for garden equipment such as lawnmowers; defendants further admit that they are informed and believe that when the property was originally acquired by Dale Beck's father, Franz Beck in about 1955, there was/were one or more UST's already on the property, and at least one of these tanks was subsequently replaced by Franz Beck, and ultimately, all tanks were removed in about 1985 . . . .

44. Defendants admit that Dale Beck's predecessor in interest in the ownership and operation of the Geary Road Service business was Franz A. Beck, now deceased . . . .

. . .

51. Defendants admit that Defendant Dale Beck may have, to some degree, contributed in the past to the presence of gasoline in the soil at the Beck property, insofar as his business activities involved the use of UST's for gasoline . . . .

. . .

64. Defendants admit that Defendant Dale Beck may have, to some degree, contributed in the past to the presence of gasoline in the soil at the Beck property, insofar as his business activities involved the use of UST's for gasoline . . . .

65. Defendants are informed and believe that, as a result of the presence of gasoline and/or chemicals or substances which Defendants understand are derived from gasoline, on the Olson property, Plaintiff Olson undertook some testing, and incurred costs as a result . . . .

. . .

96. To the extent that gasoline, or products Defendants understand are derived from gasoline, qualify as "solid wastes," "hazardous wastes," "wastes," or "hazardous substances," Defendants admit that Defendant Dale Beck may have, to some degree, contributed in the past to the presence of gasoline in the soil at the Beck property, insofar as his business activities involved the use of UST's for gasoline; Defendants otherwise deny the allegations of this paragraph.

97. To the extent that the release of gasoline, or products Defendants understand are derived from gasoline, qualify as the release of "solid wastes," "hazardous wastes," "wastes," or "hazardous substances," Defendants admit that Defendant Dale Beck may have, to some degree, contributed in the past to the presence of gasoline in the soil at the Beck property, insofar as his business activities involved the use of UST's for gasoline . . . .

Answer, ¶¶ 4-5, 14-21, 23, 25-26, 28, 31-32, 39, 42-44, 51, 64-65, 96-97.

United States District Court

For the Northern District of California

### 3.      Defendants' Admissions[4]

In response to Plaintiffs' Request for Admissions, Defendants admitted that the following

assertions relevant to the Motion are true:

> 17.  F. Alvin Beck and Sandra I. Beck purchased the Beck Property from Charles B. Beattie and Helen M. Beattie on October 29, 1956 which deed was recorded on October 31, 1956.

> . . .

> 19.  F. Alvin Beck and Sandra I. Beck transferred the Beck Property to F. Alvin Beck and Sandra I. Beck, Dale A. Beck and Bill Beck on July 29, 1983 which deed was recorded on August 5, 1983.

> 20.  F. Alvin Beck and Sandra I. Beck transferred their interest in the Beck Property to Franz A. Beck, trustee of the Beck 1990 Family Trust UTA, dated March 12, 1990.

> 21.  Bill Beck transferred his interest in the Beck Property to Dale A. Beck on March 11, 1992 which deed was recorded on March 20, 1992.

> 22.  Dale A. Beck transferred his interest in the BecK Property to Dale A. Beck and Roberta C. Beck, Trustee of the Beck 1992 Family Trust, UTA dated April 27, 1992.

> 23.  The Beck Property is currently vested as follows: Franz A. Beck, Trustee of the Beck 1990 Family Trust, UTA dated March 12, 1990, as to an undivided ½ interest and Dale A. Beck and Roberta C. Beck, Trustees of the Beck 1992 Family Trust, UTA dated April 27, 1992, as to an undivided ½ interest.

> . . .

> 29.  The gasoline contamination at the Site was caused by the leaking underground storage tanks ("USTs").

> 30.  The court in the 1992 Lawsuit determined that the Olson Property was not the source of the contamination at the Site.

> . . .

> 34.  The Olson Property is down-gradient from the Beck Property.

> 35.  The ground water and surface water flows from the Beck Property to the Olson Property.

> 36.  Soil samples at the Olson Property have high concentrations of benzene.

---

[4]Defendants stipulate that the March 7, 2008 responses to Plaintiff Robert C. Olson's Request for Admissions to Defendants 1990 Beck Family Trust, 1992 Beck Family Trust, and Dale Beck, Set One are deemed to be the responses of Defendants Dale Beck, the 1990 Beck Family Trust, the 1992 Beck Family Trust and the Estates of Franz A. Beck, Sandra I. Beck and Roberta C. Beck.  Docket No. 58.

37.  Soil samples at the Beck Property have high concentrations of benzene.

38.  The benzene contamination at the Olson Property is from the Release of Hazardous Substances at the Beck Property.[5]

. . .

47.  F. Alvin Beck (aka Franz A. Beck) owned and operated the Geary Road Service at the Beck Property.

48.  Dale Beck owned and operated the Geary Road Service at the Beck Property.

49.  Dale Beck became a partner in the Geary Road Service business with his father.

. . .

64.  USTs at the Beck Property released petroleum products into the soil at the Beck Property.

65.  USTs at the Beck Property released petroleum products into the groundwater at the Beck Property.

66.  USTs at the Beck Property released petroleum products into the soil at the Olson Property.

67.  USTs at the Beck Property released petroleum products into the groundwater at the Olson Property.

68.  USTs at the Beck Property released petroleum products into the environment.

. . .

79.  Petroleum products from the USTs at the Beck Property are hazardous substances.

. . .

84.  Hazardous substances released from the Beck Property continue to remain on the Olson Property.

. . .

87.  Hazardous substances from the Beck Property obstruct the free use of the Olson Property.

88.  Hazardous substances from the Beck Property interfere with the comfortable enjoyment of the Olson Property.

_____

[5]Defendants admit this contention in part and deny it in part, stating in their response that they believe "some of the contamination resulted from sources separate from the Beck Property.  Till Decl., Ex. 4 (Responses to RFAs), ¶ 38.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Declaration of John R. Till in Support of Motion for Summary Judgment ("Till Decl."), Ex. 4

2  (Responses to Requests for Admission, Set One).

3         **4.    The Motion**

4         In their Motion, Plaintiffs provide the following overview of the relevant facts of the case,

5  supported by Defendants' Answer and admissions, as well as a letter dated August 19, 2009 by the

6  Regional Water Quality Control Board – San Francisco Bay Region ("RWQBC") approving a

7  Corrective Action Plan ("CAP") for the Beck Property and a November 2009 "Soil Excavation

8  Report" by ETIC Engineering:[6]

9         Becks owned and operated a gas station and repair shop on the property located at 1986
       Geary Road, Pleasant Hill, California (the "Beck Property"). Till Decl., ¶¶ 2-5 (Exhibits 1 to
10      4) ([Requests for Admissions ("RFAs")], ¶¶ 17, 19, 20, 22, 47, 49, 52, 55, 103-107; Answer,
       ¶¶ 4-5, 14, 18, 43-44). Petroleum leaked from their underground storage tanks and eventually
11      spread to the soil and groundwater of Plaintiffs' adjacent lot, 1964 Geary Road, Pleasant
       Hill, California (the "Olson Property"). Till Decl., ¶¶ 2-5 (Exhibits 1 to 4)(RFAs, ¶¶ 7-8, 29,
12      34-35, 64-68, 90-93; Answer, ¶¶ 19-21, 25, 28, 31-32). It is undisputed that the Olson
       Property, which is downgradient from the Beck Property, was not the source of the
13      contamination. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 28, 29, 30, 34-35, 63; Answer,
       ¶¶ 15, 42). Instead, the high levels of contamination are from releases of hazardous
14      substances at the Beck Property. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 28, 29, 36-38,
       44, 64-68; Answer, ¶¶ 23, 26). The hazardous wastes released from Becks' underground
15      storage tanks are injurious to health, offensive to the senses, and obstruct the free use of
       property, so as to interfere with the comfortable enjoyment of the property impacted by the
16      contamination. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 28, 29, 34, 36, 45, 77-83, 87-88,
       95). Not surprisingly, Becks outright admit that it contributed to the contamination at issue.
17      Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, 64-68; Answer, ¶¶ 51, 64, 96-97, 120). Despite all
       of these admissions, Becks have allowed the hazardous wastes to continue to remain on the
18      Beck and Olson Properties. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 84, 96).  Moreover,
       despite the work under the Corrective Action Plan conducted by the settling Beck parties, the
19      contamination still remains above residential screening levels. Till Decl., ¶¶ 6-8 (Exhibits 5
       to 7), specifically see Exhibit 7 of the ETIC report at page 22, which states:

20

21      Hydrocarbon concentrations in sidewall soil samples collected along the southern
       edge of the Phase 2C area remain greater than the target residential direct exposure
22      ESLs. Specifically, the ESLs were exceeded in samples Phase 2C, 1-6 (6 foot depth);
       Phase 2C, 3-7.5 (7.5 foot depth); and Phase 2C 4-5.5 (5.5 foot depth). Maximum
23      concentrations of TPH-g (1,500 mg/kg), benzene (7.2 mg/kg), ethylbenzene (32
       mg/kg), and xylenes (120 mg/kg) (Phase 2C 3-7.5) exceed the respective residential
24      direct exposure ESLs of 540 mg/kg, 0.12 mg/kg, 2.3 mg/kg, and 31 mg/kg.

25  _____

26      [6]Defendants have not challenged any of the factual assertions offered by Plaintiffs in the Motion;
    nor have they offered specific evidence demonstrating the existence of any factual dispute as to the
27  background facts in the Motion.  Accordingly, the Court considers these facts to be undisputed.

28                                              19

**United States District Court**

For the Northern District of California

1      Exhibit 7 to Till Decl., at page 22.

2          Based on these facts, Plaintiffs argue in the Motion that they are entitled to summary

3  judgment as to the non-settling Defendants – the Estates of Franz A. Beck, Roberta C. Beck and

4  Sandra I. Beck – with respect to liability on their third through sixth causes of action.[7]

5                    **5.      Defendants' August 20, 2010 Opposition**

6          In their August 20, 2010 Opposition brief, Defendants do not address the question of whether

7  summary judgment should be entered with respect to liability as to the specific claims at issue in the

8  Motion.  Rather, Defendants concede that there are "hot spots" on the Beck Property and address

9  questions relating to the appropriate remedy, including the likely cost of remediation in comparison

10  to the value of the Beck's property.  Defendants further contend that notwithstanding the "hot

11  spots," the contamination "does not present an environmental health hazard to anyone."  Opposition

12  at 3.

13                    **6.      Fye Declaration**

14          On March 31, 2011, Defendants submitted a Declaration of Barbara J. Fye in Opposition to

15  Plaintiff's Motion for Summary Judgment Against Sandra I.Beck ("Fye Decl.").  In that declaration,

16  Barbara Fye, the daughter of Sandra I Beck, states that "[e]ven though the Beck 1990 Family Trust

17  bears [Sandra Beck's] signature dated March 12, 1990, [Sandra Beck] had did not have the mental

18  capacity to understand what she was signing; she was merely obedient to her husband."  Fye Decl., ¶

19  6.  Ms. Fye further states that at the time Sandra Beck signed the trust agreement, in 1990, she had

20  already been diagnosed with Alzheimer's disease.  *Id.*, ¶ 7.

21                    **7.      Defendants' Supplemental Opposition**

22          On April 1, 2011, Defendants filed an Opposition to Plaintiff's Motion for Summary

23  Judgment Against the Estates of Sandra I. Beck and Roberta Beck ("Supplemental Opposition").  In

24

25  _____

26          [7]Defendants stipulated to the liability of the Estate of Franz Beck in open court.  *See* June 18,
    2010 Minutes, Docket No. 124.  Therefore, the Court addresses only the liability of the Estates of
27  Sandra Beck and Roberta Beck in this Order.

28                                        20

**United States District Court**
For the Northern District of California

1  their Supplemental Opposition, Defendants argue that there can be no liability as to the estates of

2  either Sandra I. Beck or Roberta Beck.

3       As to the Estate of Sandra I. Beck, Defendants assert that there can be no liability for the

4  following reasons:

5      1.     She was never a Trustee of the 1990 Beck Family Trust. Therefore, she never had
6            legal control of the property.

    2.     Sandra I. Beck was in a state of senile dementia with Alzheimer's disease when it
7            was first discovered that there was underground oil seeping from the Beck Property
          to the Olson property. She had been diagnosed with Alzheimer's several years prior
8            to this date and at the time of the first state suit in this matter; as of that date she was
          in an institution for people severely incapacitated by Alzheimer's disease.
9
          Therefore, it is the contention of this attorney that any liability as to Sandra I. Beck
10           would be a great injustice as she could not know about the seepage problem and
          furthermore, was incapable to do anything about it even if she did.
11
          The same policy that covered Franz Beck whose estate liability was admitted by the
12           defendant Estate of Franz Beck would provide the insurance proceeds.

13           The business itself, was not owned by Sandra I. Beck and the insurance in question
          was issued in the name of the business.
14
          Therefore, there can be no liability as to Sandra I. Beck for the reasons of her mental
15           incapacity at the time she signed the trust agreement and subsequent periods after
          that. The declaration of her daughter, Barbara J. Fye, establishes that her mother
16           knew nothing about the oil spillage at any time.

17 Supplemental Opposition at 2.

18      Defendants assert that there can be no liability as to the Estate of Roberta Beck for the

19 following reasons:

20     Roberta Beck is neither a valid property owner of 1986 Geary Road, Walnut Creek, a trustee
    of the Franz and Sandra I. Beck Trust or successor trustee of that trust as witnessed by the
21     trust instrument itself, Exhibit I to this pleading, nor was she a valid owner of the trust. Dale
    Beck, who is of limited intellectual ability, conveyed half the property (1986 Geary Road) to
22     the 1992 trust, that is, to himself and his wife. That transfer was an illegal transfer as the
    Beck 1990 Family Trust requires a majority of trustees (see page 15 Exhibit I, 7.10 and 7.11)
23     The transfer of 1/2 the value of 1986 Geary Road exceeds that amount.

24     Although Dale Beck through a grant deed granted half of the property in Beck 1990 Family
    Trust to the Beck 1992 Family Trust, Exhibit II, (which is his and his deceased wife's trust)
25     that transfer was illegal. It was done without the consent of the other trustees and is in
    violation of the trust instrument itself which provides for the distribution of trust income to
26     be equally given to the beneficiaries of the trust.

27

28                            21

United States District Court

For the Northern District of California

1   I have discussed this with Mr. Till before and explained to him it was an error. I have not
2   gone to court to rectify the error because I did not want to incur the expenses in doing so.
    Mr. Till has a copy of both the 1990 Beck Family Trust and the Beck 1992 Family Trust and
3   he can read those provisions for himself. Therefore, since Roberta Beck was never a valid
    owner or a trustee of a trust which legally held the property, her estate cannot be charged
    with any of the negligence attributed to the true property owners of said property which are
4   the children of Franz A. Beck.

5   Furthermore, Dale A. Beck cannot understand the legal consequences of anything he signs.
    See Exhibit III, Deposition of Dale A. Beck dated May 16, 2006. The transfer could not have
6   been a valid transfer without the consent of at lease one of the other trustees of the Franz A.
    Beck and Sandra I. Beck Trust.

8   *Id.* at 3-4.

9          On April 20, 2011, Defendants filed the exhibits that had been cited in their supplemental

10   brief, which consisted of: 1) the trust agreement for the 1990 Beck Family Trust; 2) the trust

11   agreement for the 1992 Beck Family Trust; and 3) excerpts from Dale Beck's May 16, 2006

12   deposition. *See* Docket No. 146. The trust agreement for the 1992 Beck Family trust reflects that

13   Dale and Roberta Beck, as husband and wife, held as community property "[a]ll right, title and

14   interest in the business known as Geary Road Service." Supplemental Opposition, Ex. II (1992

15   Trust Agreement), Schedule 1.

16          **8.      Plaintiffs' Response to Supplemental Opposition**

17          On April 25, 2011, Plaintiffs filed a response to Defendants' Supplemental Opposition. As

18   an initial matter, Plaintiffs object that many of the arguments contained in the Supplemental

19   Opposition are based on factual assertions that are supported by no admissible evidence and

20   therefore cannot establish the existence of any genuine issue of material fact that defeats Plaintiffs'

21   summary judgment motion. April 25, 2011 Response at 1. As to Defendants' assertion that the

22   Estate of Sandra Beck cannot be liable because Sandra Beck did not know about the contamination

23   and was not competent to sign the 1990 Beck Family Ttrust Agreement, Plaintiffs counter that

24   liability is established nevertheless based on Defendants' admission that Sandra Beck owned the

25   Beck Property from 1956 at least until the 1990 Beck Family Trust was formed; indeed, assuming

26   that Sandra Beck lacked the capacity to transfer the Beck Property to the 1990 Beck Family Trust, as

28                                                      22

**United States District Court**

For the Northern District of California

1  Defendants now contend, Plaintiffs argue that the Estate of Sandra Beck remains the owner of the

2  Beck Property.  *Id.* at 3-5; *see also*  Declaration of John R. Till in Support of Olson's Motion for

3  Summary Judgment Against Estate of Franz A. Beck, Deceased, Estate of Roberta C. Beck,

4  Deceased, and Estate of Sandra I. Beck, Deceased ("Till Summary Judgment Decl."), Exs. 3- 4

5  (RFAs 103 - 106).  Plaintiffs also reject Defendants' assertion that Sandra Beck cannot be liable

6  because she was unaware of the contamination, pointing out that Defendants have cited no authority

7  in support of such a defense, which runs counter to California law.

8          Plaintiffs also challenge Defendants' assertion that the Estate of Roberta Beck cannot be

9  liable, pointing to Defendants' admissions establishing that Roberta Beck and Dale Beck share an

10  undivided half interest in the Beck Property.  April 25, 2011 Response at 5; *see also* Till Summary

11  Judgment Decl., Exs. 3-4 (RFAs 17-23).  Plaintiffs also assert that under California community

12  property law, Roberta Beck was an owner of Geary Road Services by virtue of her marriage to Dale

13  Beck and is therefore liable for damages resulting from her husband's operation of the business.

14  April 25, 2011 Response at 5.

15          **B.     Analysis**

16                 **1.     Legal Standard**

17          Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

18  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

19  any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

20  P. 56(c).  In order to prevail, a party moving for summary judgment must show the absence of a

21  genuine issue of material fact with respect to an essential element of the non-moving party's claim,

22  or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex*

23  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Further, "*Celotex* requires that for issues on which the

24  movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

25  genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

26  bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

27

28                                                        23

*Fitzpatrick v. City of Atlanta*,  2 F.3d 1112, 1116 (11th Cir. 1993).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. at 323.  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

**2.      Claim Three (Abatement of an Imminent and Substantial Endangerment Pursuant to RCRA § 7002(a)(1)(B))**

Plaintiffs seek summary judgment on their claim for  abatement and substantial endangerment under Section 7002(a)(1)(B) of the RCRA.  That section provides, in relevant part, as follows:

(a) In general

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf–

. . .

(1) (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . .

42 U.S.C. § 6972(a)(1)(A).  The undisputed facts establish that the Estates of Sandra I. Beck and Roberta Beck are liable on this claim.

**a.      "any person, including . . . any past or present . . . owner or operator of a . . . storage facility"**

The undisputed evidence, namely, the Answer, admissions and Schedule 1 of the 1992 Trust Agreement, establish that both Sandra I. Beck and Roberta Beck were owners and/or operators of the Beck Property and Geary Road Service at some point during the time in which the contamination occurred and that in the course of their business, they stored gasoline in underground storage tanks.

24

United States District Court

For the Northern District of California

1  Till Decl., Ex. 3 (RFAs),  ¶¶ 17-23, 103-106 (admissions that Sandra Beck owned the Beck property

2  from 1956 to at least 1990 and that Dale Beck transferred his interest received from William Beck

3  on August 5, 1983 into the Beck 1992 Family Trust, owned by Dale Beck and Roberta Beck, as

4  husband and wife.);  Answer, ¶¶ 4-5, 14, 18, 43-44; Supplemental Opposition, Ex. II at p. 1

5  (schedule reflecting that Roberta Beck and Dale Beck were owners of Geary Road Services, which

6  was held as community property).  Therefore, the Estates of Sandra I. Beck and Roberta Beck are

7  "persons" and "past or present owner[s]" of a storage facility under the RCRA.[8]

8

9             **b.**    **"contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste"**

10        "Individuals are liable under RCRA without regard to fault or negligence." *Zands v. Nelson*,

11  797 F.Supp. 805, 809 (S.D. Cal. 1992)(citations omitted).  Here, the Becks admit that they

12  "contributed in the past to the presence of gasoline in the soil" and that "[t]he gasoline

13  contamination at the Site was caused by the leaking underground storage tanks ('USTs')."  Till

14  Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 7-8, 29, 3-35, 64- 68, 90-96; Answer, ¶¶ 51, 64 -68, 96-97,

15  120) (emphasis added).  The Becks also admit that the Olson Property, which is down-gradient from

16  the Beck Property, was not the source of the contamination. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4)

17  (RFAs, ¶¶ 28-30, 34-35, 63-68, 90-93; Answer, ¶¶ 15, 42).  Finally, the Becks admit that the

18  gasoline is a hazardous waste. Till Decl., ¶¶ 2-5 (RFAs 77-80, 84, 87, 94, 95).  Therefore, the

19  undisputed facts establish that the Becks contributed to the past or present handling, storage,

20  treatment, transportation, or disposal of a solid and hazardous waste under the RCRA.

21  —————————————

22      [8]Because the undisputed evidence shows that both Sandra and Roberta Beck at some time had an ownership interest in the Beck Property or Geary Road Services, the Court does not need to address,

23  for the purposes of deciding Plaintiffs' summary judgment motion on liability,  Defendants' eleventh-hour assertions that transfers by Sandra Beck and Dale Beck of their interests in the Beck Property were

24  not valid.  *See  Zands v. Nelson*, 797 F.Supp. 805, 811 (S.D. Cal. 1992) (noting that at trial the various defendants would have the opportunity establish the portion of contamination for which each was liable

25  under the RCRA based on the time the contamination occurred relative to when each defendant owned the property at issue); *Mangini v. Aerojet-General Corp*. 230 Cal.App.3d 1125, 1136 (1991) ("Nor is

26  it material that defendant allegedly created the nuisance at some time in the past but does not currently have a possessory interest in the property. '[N]ot only is the party who maintains the nuisance liable but

27  also the party or parties who create or assist in its creation are responsible for the ensuing damages.'").

28                              25

1

2              **c.      "which may present an imminent and substantial endangerment
                         to health or the environment"**

3

4          Section 7002(a)(1)(B) provides for relief where conditions "*may* present an imminent and

5   substantial endangerment to health or the environment." *California Dep't of Toxic Substances

6   Control v. Interstate Non-Ferrous Corp.*, 298 F.Supp.2d 930, 980 (E.D. Cal. 2003) (emphasis

7   added).  Congress preceded the standard of liability with the term 'may,' "to confer upon the courts

8   the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed

9   by toxic wastes." *Id.* (citing *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429, at *12 (E.D. Cal.

10  Jan. 21, 1993)).  In *California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,

11  the court addressed the meaning of the terms "imminent," "substantial" and "endangerment" as used

12  in the RCRA:

13          " 'Endangerment' means a threatened or potential harm and does not require proof of actual
            harm." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Dague*, 935
14          F.2d at 1356. "Endanger means something less than actual harm. When one is endangered,
            harm is threatened; no actual injury need ever occur." *Lincoln Properties, Ltd. v. Higgins*,
15          1993 WL 217429 *12 (E.D.Cal.) citing *Ethyl Corp. v. Environmental Protection Agency*, 541
            F.2d 1, 13 (D.C.Cir.1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976)
16          (internal quotation marks omitted).

17          "A finding of 'imminence' does not encompass a showing that actual harm will occur
            immediately so long as the risk of threatened harm is present." *Lincoln Properties, Ltd. v.
18          Higgins*, 1993 WL 217429 *13 (E.D.Cal.) citing *Dague*, 935 F.2d at 1356; see also
            *Conservation Chemical*, 619 F.Supp. at 193 ("An endangerment need not be immediate to be
19          'imminent,' and thus warrant relief"). "An endangerment is 'imminent' if factors giving rise
            to it are present, even though the harm may not be realized for years." *Lincoln Properties,
20          Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Conservation Chemical*, 619 F.Supp. at
            193–94.

21

22          "'Substantial' does not require quantification of the endangerment ( e.g., proof that a certain
            number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will
23          be contaminated to a specific degree) .... endangerment is substantial if there is some
            reasonable cause for concern that someone or something may be exposed to a risk of harm by
24          a release or a threatened release of a hazardous substance if remedial action is not taken."
            *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Conservation
25          Chemical*, 619 F.Supp. at 194.

26

    *Id.*

27

28                                                  26

United States District Court
For the Northern District of California

The undisputed facts establish, as a matter of law, that the past handling, storage, treatment, transportation, or disposal of hazardous wastes on the Beck Property may present an imminent and substantial endangerment to health or the environment under the RCRA.  In particular, Defendants admit that "[t]he petroleum products released from the USTs at the Beck Property are hazardous wastes." Till Decl., ¶¶ 2-5 (Exhibits 1 to 4)(RFAs, ¶ 80, also see 77-79, 81-84, 87, 90-96). Defendants further admit that "[h]azardous substances released from the Beck Property continue to remain on the Olson Property." Till Decl., ¶¶ 2-5 (Exhibits 1 to 4)(RFAs, ¶ 84, also see 77-79, 80-83, 87, 90-96). This admission is consistent with the relevant environmental regulations. 40 C.F.R. § 261.31. Defendants also do not dispute that the Beck Property and the Olson Property are in areas zoned as residential. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 13, 24-25). These admissions are sufficient to establish, as a matter of law, that the contamination of the Beck property may present an imminent and substantial endangerment to health or the environment under the RCRA .  Finally, in light of their previous admissions, Defendants' conclusory assertion in their Supplemental Opposition that the contamination does not pose a threat to human health is not enough to create a disputed issue of fact.

Plaintiffs are entitled to summary judgment as to liability on Claim Three.

### 3.      Claims Four through Six (Nuisance Claims)

Plaintiffs have asserted claims for private nuisance, public nuisance and nuisance per se against Defendants.   Based on the undisputed facts, the Court concludes that Plaintiffs are entitled to summary judgment on Plaintiff's private nuisance claim but that they have not carried their burden on summary judgment as to the claims for public nuisance and nuisance per se.

The California Civil Code defines a nuisance as follows:

> Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance.

1   Cal. Civ. Code Section 3479.   Civil Code section 3480 further provides that "[a] public nuisance is

2   one which affects at the same time an entire community or neighborhood, or any considerable

3   number of persons, although the extent of the annoyance or damage inflicted upon individuals may

4   be unequal." California Civil Code section 3493 provides that "[a] private person may maintain an

5   action for a public nuisance, if it is specially injurious to himself, but not otherwise." Finally, a

6   nuisance per se exists where the nuisance is "legislatively declared." *People. ex. rel. Department of*

7   *Public Works v. Adco Advertisers*, 35 Cal. App. 3d 507, 511-12 (3rd Dist. 1973) (finding nuisance

8   per se where statute provided that "All advertising displays which are placed or which exist in

9   violation of the provisions of [the Act] are public nuisances and may be removed by any public

10  employee as further provided in [the Act]").   In the case of nuisance per se, the only triable issue is

11  whether the conditions specified in the statute or ordinance exist.  *Id.*; see also *Lincoln Properties,*

12  *Ltd. v. Higgins*, 1993 WL 217429, at *25 (E.D. Cal. 1993) (finding that the plaintiff established a

13  nuisance per se against dry cleaning defendants related to soil and groundwater contamination on

14  grounds that "San Joaquin County Code § 1–2004 provides that '[a]ny condition existing in

15  violation of the code is a public nuisance.' The dry cleaning defendants have therefore created a

16  public nuisance by violating both the discharge permit requirement of County Code § 5–6200 and §

17  5–6400 of the County Code.").

18          Here, as discussed above, the undisputed facts establish that the USTs on Defendants'

19  property have leaked gasoline that has contaminated the Olson Property, including its groundwater.

20  Till Decl.,¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶ 29; Answer, ¶¶ 51, 64, 96-97, 120).  Furthermore, the

21  Becks admit that the hazardous wastes released from the USTs on the Beck Property are injurious to

22  health, offensive to the senses, and obstruct the free use of property, so as to interfere with Plaintiffs'

23  comfortable enjoyment. Till Decl., ¶¶ 2-5 (Exhibits 1 to 4) (RFAs, ¶¶ 77-83, 87-88, 95).  Therefore,

24  based on Defendants' admissions, Plaintiffs are entitled to summary judgment on the private

25  nuisance claim.

26

27

28                                                              28

Plaintiffs also assert that they are entitled to summary judgment on their nuisance per se claim based on the California Water Code.  In particular, they invoke California Water Code Section 13304(a).  That section provides as follows:

> a) Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts. A cleanup and abatement order issued by the state board or a regional board may require the provision of, or payment for, uninterrupted replacement water service, which may include wellhead treatment, to each affected public water supplier or private well owner. Upon failure of any person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring the person to comply with the order. In the suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant.

Cal. Water Code Section 13304(a).  Plaintiffs further point to Section 13050, defining "waters of the state" as any surface water or groundwater, including saline waters, within the boundaries of the state."  Cal. Water Code Section 13050(e).  In contrast to the cases cited by Plaintiffs, *Adco Advertising* and *Lincoln Properties*, in which a nuisance per se was found on the basis of statutes that expressly defined conduct or conditions that constituted a "public nuisance," the provision cited by Plaintiffs contains no such legislative declaration.  Accordingly, the Court denies Plaintiffs' request for summary judgment on this claim.

Similarly, with respect to the public nuisance claim, Plaintiffs have not demonstrated as a matter of law that the contamination affects the "entire community."  Although Plaintiffs assert that "if the migration of [the] contaminants is not abated, they will migrate further," Motion at 8, they have not cited any admissions or evidences showing that the contamination presents a nuisance *currently* to the community or that the contamination affected the entire community in the past. Therefore, the Court declines to enter summary judgment in Plaintiffs' favor on this claim.

**IV.     CONCLUSION**

For the reasons stated above, the Motion is GRANTED as to Claims Three and Six.  The Motion is DENIED as to Claims Four and Five.  A Case Management Conference shall be conducted on October 21, 2011 at 1:30 p.m. to address case management issues related to the liability phase of the case.  The parties shall file a joint case management conference statement no later than October 14, 2011.

IT IS SO ORDERED.


Dated: October 5, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge

30